$250.00

HH

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NEIL J. BEAUCHAMP | : |
| Plaintiff, | : CIVIL ACTION NO. |
| v. | : 05cv5667 |
| TRAMMELL CROW COMPANY | : |
| Defendant. | : |



## COMPLAINT AND JURY DEMAND

### PARTIES

1. Plaintiff, Neil J. Beauchamp ("Beauchamp") is an adult individual and citizen of the Commonwealth of Pennsylvania, having a residence at 1559 Tarrington Way, Hatfield, Pennsylvania.

2. Defendant, Trammell Crow Company ("Trammell Crow") is, upon information and belief, a corporation organized and existing under the laws of the State of Texas, having at all times relevant and material, a principal place of business at 5400 Legacy Drive, Plano, Texas.

3. Trammell Crow Company is a building management, brokerage and development and project management (public) company, offering "end-to-end" services that encompass the total real estate cycle tailored for users of commercial real estate and facilities, and investors in commercial real estate for virtually every industry on a worldwide basis.

4. At all times relevant and material, Trammell Crow acted by and through its duly

1



authorized officers, agents, servants and/or employees who at all times relevant and material, acted within the scope of their authority and within the course of Trammell Crow's business, mission and affairs.

## JURISDICTION AND VENUE

5. Jurisdiction is conferred upon this district court pursuant to 28 U.S.C. §1332, in that the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and the action is between citizens of different states.

6. This district court has venue over the action pursuant to 28 U.S.C. §1391, in that the defendant, a corporation, is subject to personal jurisdiction in this Commonwealth of Pennsylvania as of the date of this action commenced and therefore is deemed a resident of this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

Beauchamp's Towers Perrin employment

7. Neil Beauchamp began his employment with Towers Perrin Company in 1989 as a senior facilities specialist, working in Philadelphia, Pennsylvania  At the time he was hired, Beauchamp had 18 years experience in facilities management with SmithKline Beecham in the Philadelphia region.

8. Towers Perrin is a global professional services (private) company providing innovative business solutions to government and private sector clients in the areas of human resources, design and management, actuarial and management consulting to the financial services and reinsurance intermediary industries.

9. Beauchamp received significant promotions at Towers Perrin: to director, facilities services in1993; to manager, central services TPAS in 1995; to manager, facilities services TPAS in 1997; and to global office support manager in 2004. Beauchamp received salary/benefit increases and other performance awards commensurate with his advancement and overall had an outstanding career at Towers Perrin.

10. Beachamp's duties with Towers Perrin as a senior facilities manager included management in the areas of office facilities administration which included *inter alia*: facilities services, project and construction management, office renovation, architectural renovation (interiors/furniture), telecommunications, security, reprographics, and conference training center work.

11. Beauchamp's duties in facility management, as regards particular site locations, also involved the development and management of budgets in the areas of capital, operations and site-specific projects, reporting to top management.

12. In 1995, Towers Perrin created a division known as Towers Perrin Administration Solutions ("TPAS"), and transferred under the umbra of this division, key operational components of Towers Perrin, including all areas of facilities management within Beauchamp's responsibilities, as well as administrative support, financial, and human resources departments of Towers Perrin.

13. As a result of the new TPAS division, nothing changed concerning Beauchamp's facilities management duties and responsibilities, or his Towers Perrin employment, and Beauchamp continued to manage the facilities administration, as a senior facilities manager, for TPAS facilities in Philadelphia, PA, Cherry Hill, NJ, and Chesapeake, VA and locations in

Mississauga, CA, Bristol, UK, Sydney, AU, and Rotterdam, NE, with the same duties and responsibilities as enumerated in paragraphs 10 and 11, above.

Beauchamp's transition from Towers Perrin to EDS

14. On or about April 1, 2005, Towers Perrin sold the TPAS division to Electronic Data Systems ("EDS"), under a corporate arrangement not fully disclosed to Beauchamp or other Towers Perrin employees. EDS, a fortune 500 company, was (and is) a leading global technology services (public) company involved in the outsourcing information services to clients in the governmental and public sectors around the world.

15. On February 14, 2005 in anticipation of completing the TPAS acquisition, EDS offered to Beauchamp in writing an employment position with EDS, to work in an identical capacity as his current employment with TPAS as a senior facilities manager responsible for the Philadelphia, PA, Cherry Hill, NJ and Chesapeake, VA sites (the "EDS offer letter"), to be known as the "EDS-Towers Perrin account".

16. Beauchamp accepted the terms of employment outlined in the EDS offer letter and, on or about April 1, 2005, signed the offer letter (the "EDS contract"). Under the EDS contract, Beauchamp's salary, benefits and employment commencement date carried over from his Towers Perrin employment, with new opportunities for performance bonuses.

17. Under the EDS contract, Mr. Beauchamp was employed under a for-cause termination provision not relevant to this action. The EDS contract further provided, in pertinent part:

> [I]f, within twenty-four (24) months following your start date with EDS, your

employment is terminated other than for "Cause" (defined in Attachment "A"), then EDS will provide you a lump sum payment, in lieu of any other separation or severance payment, in an amount equal to four (4) weeks of "Salary" (as defined below) plus an additional two (2) weeks of Salary for each completed year of service, up to a maximum total of 44 weeks of Salary.

18. Beauchamp's EDS employment as senior facilities manager began April 1, 2005; shortly thereafter, EDS management began to outsource the entire EDS real estate portfolio including all staff, to a company known as Trammell Crow Company based in Plano, Texas, and Beauchamp's duties and responsibilities at EDS diminished commensurately, although his position and classification remainded intact .

Beauchamp's transition from EDS to Trammell Crow Company

19. In or about June of 2005, EDS was planning to outsource its real estate portfolio to Trammell Crow Company ("Trammell Crow"), under a corporate arrangement not fully disclosed to Beauchamp or other EDS employees similarly situated as Beauchamp.

20. On July 12, 2005 in anticipation of completing the outsourcing contract, Trammell Crow offered to Beauchamp in writing an employment position with Trammell Crow, to work in an identical capacity as his current employment with EDS as a senior facilities manager responsible for the Philadelphia, PA, Cherry Hill, NJ and Chesapeake, VA sites (the "Trammell Crow offer letter"), which in the offer letter was simply known as "the EDS assignment in Philadelphia".

21. Beauchamp accepted the terms of employment outlined in the Trammell Crow offer letter and on or about July 15, 2005, signed the offer letter (the "Trammell Crow contract").

Under the Trammell Crow contract, Mr. Beauchamp's salary, benefits and employment commencement date carried over from his EDS employment, with new opportunities for performance bonuses.

22. Under the Trammell Crow contract, Mr. Beauchamp was employed under an express severance provision tied, in part, to the EDS contract, which states in pertinent part:

> If your employment is terminated during the first two years of your TCC employment while you are assigned to the EDS account, and you are eligible for severance (i.e., your termination is not for cause), you will be eligible for a lump sum payment equivalent to the greater of 1) the amount of severance provided under TCC's severance plan in effect at the time of your termination (based on your TCC hire date), or 2) your vested EDS severance balance as of July 15, 2005.

23. Mr. Beauchamp began his employment with Trammell Crow Company, under the Trammell Crow contract, on July 16, 2005.

## COUNT I

### Neil J. Beauchamp v. Trammell Crow Company
### [Breach of Contract]

24. Plaintiff, Neil J. Beauchamp incorporates herein by reference paragraphs 1 through 23, inclusive, as though the same were more fully set forth at length.

25. Upon transition to EDS, under the EDS contract, Beauchamp's 16 years of facilities management experience, ten of which were as a senior manager, was in view by EDS at the time the offer was made, and the cornerstone of the EDS offer as represented by senior management.

26. Upon transition to Trammell Crow, under the Trammell Crow contract, Beauchamp's total facilities management experience, as well as his EDS assignment as senior facilities

manager, was likewise in view by Trammell Crow at the time the offer was made, and the cornerstone of the Trammell Crow offer as represented by Trammell Crow senior management.

27. Under the Trammell Crow contract, the three sites (Philadelphia, Cherry Hill and Chesapeake) and the facilities management duties at these sites, clearly comprised the material part of Mr. Beauchamp's Trammell Crow employment at the Philadelphia facility (the EDS assignment), a fact that Trammell Crow senior management had knowledge of, and Trammell Crow intended that Beauchamp rely.

28. Beauchamp had a contract with employment with Trammell Crow Company, under the Trammell Crow contract.

29. Trammell Crow Company breached the Trammell Crow contract, through various acts, conduct, omissions and misstatements and/or misrepresentations of material fact directed towards Beauchamp and his employment, which began shortly after his Trammell Crow employment began, as follows:

(a) failing, neglecting and refusing to assign Beauchamp facility (site) responsibility, at any site, in any capacity, notwithstanding the above-referenced three sites are in place and are managed by less experienced employees subordinate in tenure and background to Beauchamp;

(b) offering and/or assigning or attempting to assign as Beauchamp's principal job duties, work in the areas of health, safety and environmental compliance - all technical areas where Beauchamp has no academic knowledge or training, or experience;

(c) offering and/or assigning or attempting to assign as Beauchamp's job duties, work in the area of outsourcing a consultant for health, safety and environmental compliance, in

a management or oversight capacity and/or as a non-participatory member of a committee, where Beauchamp lacks qualifications or experience;

(d) re-badging, under a putative organizational chart evidencing Beauchamp has no employment with Trammell Crow, Beauchamp as "special projects", without specifying Beauchamp's employment role or any special projects involving *any type* of site work for Beauchamp to actually manage or work on;

(e) assigning and/or attempting to assign to Beauchamp, "site re-branding work" involving EDS logo/signage at select locations, which is site work typically to be performed by the facilities site manager, not a senior facilities manager, and not the type of work Beauchamp was hired to perform under the Trammell Crow contract;

(f) assigning and/or attempting to assign to Beauchamp, a site inspection for the Charleston, West Virginia location, which work Trammell Crow cancelled when Trammell Crow determined the data center at the site required a different resource to inspect the site;

(g) placing a lesser experienced, lesser qualified subordinate than Beauchamp, in a position as a facility site manager - a position that, compared to Beauchamp's current work (or lack of work), carries more responsibility and visability;

(h) failing, neglecting and/or refusing to provide Beauchamp with any explanation as to why Beauchamp has not been assigned any facilities management work in any capacity, or any meaningful facilities work, beyond bald-faced absurd statements by management that: " the company cannot afford you in the facilities management position" or "I know it is not the role the company initially discussed with you, but it is the role TCC needs to fill to support TCC's EDS client";

(i) threatening Beauchamp with a derogatory performance review amounting to willful neglect, in response to Beauchamp's challenge of management's decision to force Beauchamp to perform, or supervise, technical health, safety and environmental compliance work he was not qualified or trained to do;

(j) failing, neglecting and/or refusing to honor and/or perform the employment obligations enumerated in the offer letter and the Trammell Crow contract;

(k) failing, neglecting and/or refusing to disclose full, accurate and/or complete information concerning the offer letter, or the Trammell Crow contract, as regards Beauchamp's employment thereunder;

(l) failing, neglecting and/or refusing to honor Beauchamp's demands for full severance, or to pay severance to Beauchamp, in the amounts and under the provisions of the Trammell Crow contract;

(m) failing, neglecting and/or refusing to honor Beauchamp's demands for expense reimbursement, for company expenses incurred and paid by Beauchamp;

(n) failing, neglecting and refusing to respond to, or even address, Beauchamp's repeated demands for clarification of his current position, except to present Beauchamp with information evidencing Beauchamp *never* had a position as senior facilities manager at Trammell Crow Company;

(o) failing, neglecting and refusing to deal with Beauchamp honestly, openly, fairly and in good faith, under the Trammell Crow contract;

(p) terminating Beauchamp's employment as a matter of law;

(q) breaching the Trammell Crow contract as a matter of law.

30. As a direct and proximate result of the breach, Beauchamp has sustained actual damages and harm, including damages accrued, due and owing to Beauchamp under the Trammell Crow contract in the form of: severance pay, bonus pay, interest, expense reimbursement, interest on said amounts, and other damages to be ascertained, which amounts in the aggregate exceed $100,000.

31. Demand for the foregoing damages has been made by plaintiff, Beauchamp.

32. Despite clear and repeated demand, defendant, Trammell Crow Company has failed, neglected and refused to pay all or any portion of the damages to plaintiff.

WHEREFORE, plaintiff, Neil J. Beauchamp demands judgment in his favor and against defendant, Trammell Crow Company, for monetary damages in excess of $100,000, incidental and/or consequential damages, interest, costs of suit and such other relief as the court deems just.

## COUNT II

Neil J. Beauchamp v. Trammell Crow Company
[Misrepresentation and Deceit]

33. Plaintiff, Neil J. Beauchamp incorporates herein by reference paragraphs 1 through 32, inclusive, as though the same were more fully set forth at length.

34. The Trammell Crow offer letter and contract contained express and/or implied promises, statements, representations as aforesaid, including, *inter alia,* provisions concerning Beauchamp's employment, and the offer of employment, at Trammell Crow.

35. The promises, statements and representations under the Trammell Crow contract, and the offer of employment, considered as a whole, were: Beauchamp will work in "the position of

Facilities Manager on the EDS assignment in Philadelphia" under specified terms/rates and other provisions, more specifically referred to as "the EDS account".

36. In exchange therefore, and as further consideration for his employment, the promises and representations by Trammell Crow under the Trammell Crow contract were, among other provisions: Beauchamp will receive his full severance package, as a "benefit concession", if his "employment [would be] terminated [without cause] during the first two years of TCC employment while assigned to the EDS account.

37. Beauchamp was always assigned to the EDS account.

38. Beauchamp's employment has been terminated without cause by Trammell Crow.

39. The Trammell Crow contract, and the promises and representations made therein, including the provisions regarding severance, were made by Trammell Crow with the intent to induce Beauchamp to accept the contract and the employment with Trammell Crow and, further, were made with actual knowledge or reason to know and expect Beauchamp intended to and would rely upon same.

40. In accepting the offer of employment with Trammell Crow Company, and entering into the Trammell Crow contract, Beauchamp forfeited his ability and position to demand and/or negotiate his severance package under the EDS contract, a fact which both Trammell Crow and EDS knew or should have known, and purposefully induced, and Beauchamp relied.

41. The promises, statements and representations were material, and false and misleading when made, or made with intentional and reckless disregard for the truth, as evidenced by the utter lack of any facilities management employment for Beauchamp at Trammell Crow, and Beauchamp justifiably and reasonably relied thereon.

11

42. In the alternative, Trammell Crow purposefully misled Beauchamp, and/or failed to disclose important information as a scheme, executed in part with EDS, to cover (or avoid) the payout of his EDS severance under the Trammell Crow-EDS acquisition.

43. Trammell Crow purposely misled Beauchamp, as an improper attempt to set Beauchamp up to suffer performance issues to avoid a payout of his Trammell Crow severance, leaving Beauchamp to twist slowly with no severance.

44. Trammell Crow therefore purposefully informed Beauchamp of an important business matter and induced Beauchamp, and Beauchamp reasonably relied thereon.

45. As a direct and proximate result of the foregoing, Beauchamp has sustained actual damages and harm, including damages accrued, due and owing to Beauchamp under the Trammell Crow contract in the form of: severance pay, bonus pay, interest, expense reimbursement, interest on said amounts, and other damages to be ascertained including harm to his career and performance in his chosen profession, which amounts in the aggregate exceed $100,000.

46. Trammell Crow acted intentionally and wilfully, and wantonly, towards Beauchamp and his employment, knowing or having reason to know to a high degree of probability that harm would befall Beauchamp, both as regards his employment, his severance, his livelihood, and career in his choosen profession.

47. Demand for the foregoing damages has been made by plaintiff, Beauchamp.

48. Despite clear and repeated demand, defendant, Trammell Crow Company has failed, neglected and refused to pay all or any portion of the damages to plaintiff.

WHEREFORE, plaintiff, Neil J. Beauchamp demands judgment in his favor and against defendant, Trammell Crow Company, for monetary damages in excess of $100,000, incidental and/or consequential damages, exemplary and/or punitive damages, interest, costs of suit and such other relief as the court deems just.

                                           _____
                                           J. Stephen Woodside
                                           Attorney for plaintiff,
                                           Neil J. Beauchamp

OF COUNSEL:

J. STEPHEN WOODSIDE, P.C.
One Montgomery Plaza
425 Swede Street, Suite 605
Norristown, PA 19401
(610) 278-2442

Dated:  October 25, 2005

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

                                                                            _____
                                                                            J. Stephen Woodside
                                                                            Attorney for plaintiff,
                                                                            Neil J. Beauchamp

Dated:   October 25, 2005